ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - x

                                              :
UNITED STATES OF AMERICA                      :        SEALED INDICTMENT
                                              :
            -v.-                              :        22 Cr.
                                              :
GRAHAM BONHAM-CARTER,                          22 CRIM ?03
                                              :
            Defendant.                        :
                                              :
- - - - - - - - - - - - - - - - - - - - - - - x

COUNT ONE

(Conspiracy to Violate the International Emergency Economic
Powers Act)

The Grand Jury charges:

**The Defendant**

1.      From at least in or about 2003 through in or about
the present, GRAHAM BONHAM-CARTER, the defendant, worked as a
manager for several real estate properties around the world owned
by Oleg Vladimirovich Deripaska, a Russian national who has been
subject to economic sanctions in the United States since April
2018.   Despite   knowledge   of   those   sanctions,   BONHAM-CARTER
continued to provide services to and for the benefit of Deripaska
in connection with real estate and artwork located in the United
States after Deripaska was sanctioned.

**The International Emergency Economic Powers Act and the Relevant
Sanctions Orders and Regulations**

2.      The   International   Emergency   Economic   Powers   Act
("IEEPA"), codified at Title 50, United States Code, Sections 1701-

1708, confers upon the President authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States. Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter." 50 U.S.C. § 1705(a).

       3.   In 2014, pursuant to his authorities under the IEEPA, the President issued Executive Order 13660, which declared a national emergency with respect to the situation in Ukraine. To address this national emergency, the President blocked all property and interest in property that were then or thereafter came within the United States or that were then or thereafter came within the possession or control of any United States person, of individuals determined by the Secretary of the Treasury to meet one or more enumerated criteria. These criteria include, but are not limited to, individuals determined to be responsible for or complicit in, or who engage in, actions or policies that threaten the peace, security, stability, sovereignty, or territorial integrity of Ukraine; or who materially assist, sponsor, or provide financial, material, or technological support for, or goods or services to, individuals or entities engaging in such activities. Executive Order 13660 prohibits, among other things, the making of any contribution or provision of funds, goods, or services by, to,

or for the benefit of any person whose property and interests in property are blocked, and the receipt of any contribution or provision of funds, goods, or services from any such person.

4.    The national emergency declared in Executive Order 13660 with respect to the situation in Ukraine has remained in continuous effect since 2014, and was most recently continued on March 2, 2021.

5.    The President twice expanded the scope of the national emergency declared in Executive Order 13660, through: (1) Executive Order 13661, issued on March 16, 2014, which addresses the actions and policies of the Russian Federation with respect to Ukraine, including the deployment of Russian Federation military forces in the Crimea region of Ukraine; and (2) Executive Order 13662, issued on March 20, 2014, which addresses the actions and policies of the Government of the Russian Federation, including its purported annexation of Crimea and its use of force in Ukraine. Executive Orders 13660, 13661, and 13662 are collectively referred to as the "Ukraine-Related Executive Orders."

6.    The Ukraine-Related Executive Orders authorized the Secretary of the Treasury to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President under the IEEPA, as may be necessary to carry out the purposes of those orders. The Ukraine-Related Executive Orders further authorized the Secretary of the Treasury

3

to redelegate any of these functions to other offices and agencies of the United States Government.

7.   To implement the Ukraine-Related Executive Orders, the Department of the Treasury's Office of Foreign Assets Control ("OFAC") issued certain Ukraine-Related Sanctions Regulations. These regulations incorporate by reference the definition of prohibited transactions set forth in the Ukraine-Related Executive Orders. *See* 31 C.F.R. § 589.201. The regulations also provide that the names of persons designated directly by the Ukraine-Related Executive Orders, or by OFAC pursuant to the Ukraine-Related Executive Orders, whose property and interests are therefore blocked, are published in the Federal Register and incorporated into the Specially Designated Nationals ("SDN") and Blocked Persons List (the "SDN List"), which is published on OFAC's public website. *Id.* n.1.

8.   According to the Ukraine-Related Sanctions Regulations, a person whose property and interest in property is blocked pursuant to the Ukraine-Related Executive Orders is treated as having an interest in all property and interests in property of any entity in which the person owns, directly or indirectly, a 50 percent or greater interest. *See* 31 C.F.R. § 589.406. Accordingly, such an entity is deemed a person whose property and interests in property are blocked, regardless of

whether the name of the entity is incorporated into OFAC's SDN List. *Id.*

9.    On or about April 6, 2018, OFAC designated Deripaska as an SDN pursuant to the Ukraine-Related Executive Orders. Deripaska was designated pursuant to Executive Order 13661 for having acted or purported to act for or on behalf of, directly or indirectly, a senior official of the Government of the Russian Federation, as well as pursuant Executive Order 13662 for operating in the energy sector of the Russian Federation economy.

### BONHAM-CARTER's Work for Deripaska Post-Sanctions

10.    Beginning in or about July 2003 up to in or about the present, GRAHAM BONHAM-CARTER, the defendant, has worked for entities controlled by Deripaska. Among other things, BONHAM-CARTER manages Deripaska's residential properties located in the United Kingdom and Europe, including a house in Belgravia Square, London.

11.    Even after OFAC designated Deripaska, BONHAM-CARTER continued to work for Deripaska and refer to Deripaska as his "boss." GRAHAM-CARTER was aware of the sanctions on Deripaska. For example:

a.        In an email dated on or about June 18, 2018, BONHAM-CARTER wrote: "Times a bit tough for my boss as sanctions have hit him from the USA so not an ideal time."

b.        In an email dated on or about July 17,

2018, BONHAM-CARTER wrote: "[T]imes are a little stressful as we as a company are involved in the USA sanctions on Russians."

      c.      In an email dated on or about January 7, 2020, BONHAM-CARTER wrote in response to an inquiry regarding "Mr. Deripaska": "To be honest, now is not the best moment to approach Mr[.] D as life is extremely awkward with USA sanctions, FBI and Homeland interrogations...."

      d.      In an e-mail dated on or about October 13, 2021, Bonham-Carter wrote: "It[']s all good apart from banks keep shutting me down because of my affiliation to my boss Oleg Deripaska.... I have even been advised not to go to the USA where Oleg still has personal sanctions as the authorities will undoubtedly pull me to one side and the questioning could be hours or even days!!"

      12. Shortly after OFAC designated Deripaska on or about April 6, 2018, Deripaska instructed GRAHAM BONHAM-CARTER, the defendant, to set up a company to manage Deripaska's properties. On or about May 25, 2018, BONHAM-CARTER wrote in an email that "OVD [*i.e.*, Deripaska] wants me to set up my own company to run the [Belgravia Square] house and to possibly include Japan, Italy, China and more." Less than two months later, on or about July 17, 2018, BONHAM-CARTER incorporated GBCM Limited, which signed a property management agreement to manage Deripaska's real estate holdings in Belgravia Square.

## The Sanctions Violations

13.   From at least in or about 2003 through in or about the present, GRAHAM BONHAM-CARTER, the defendant, provided funds, goods, and services to and for the benefit of Deripaska and companies owned and controlled by Deripaska, and received funds, goods, and services from Deripaska. In particular, BONHAM-CARTER continued to engage in this conduct after OFAC had designated Deripaska as an SDN, in violation of the Ukraine-Related Sanctions Regulations.

### BONHAM-CARTER's Funding of the Gracetown Properties

14.   Between in or about 2005 and in or about 2008, Deripaska purchased three residential properties in the United States, two in New York, New York and one in Washington, D.C. (together, the "U.S. Properties"). The properties were managed by a company named Gracetown, Inc.

15.   After OFAC imposed sanctions on Deripaska on or about April 6, 2018, Gracetown, Inc. continued to manage the U.S. Properties for the benefit of Deripaska.

16.   Between in or about March 2021 and in or about December 2021, after OFAC imposed sanctions on Deripaska, GRAHAM BONHAM-CARTER, the defendant, acting on instructions from other employees of Deripaska and entities controlled by Deripaska, transmitted payments for the upkeep of the Gracetown Properties. BONHAM-CARTER wired payments totaling $1,043,964.30 from a bank

account in Russia held in the name of BONHAM-CARTER's company, GBCM Limited, to bank accounts held by Gracetown Inc. in New York, New York. Gracetown Inc. used the funds from GBCM Limited to pay for various expenses associated with the Gracetown Properties, including staff salaries, property taxes, and other services, and to maintain and keep up the Gracetown Properties. BONHAM-CARTER transmitted these wires while still in Deripaska's employ.

<u>BONHAM-CARTER's Attempt to Expatriate Deripaska's Artwork</u>

17. On or about April 18, 2008, Deripaska purchased 18 pieces of artwork (the "Artwork") at an auction house located in New York, New York (the "Auction House") through a shell company called Turcos Limited. Deripaska used an intermediary who placed the bid at the Auction House on behalf of Turcos Limited ("Bidder-1"). After Deripaska purchased the Artwork, it was not immediately collected and the Auction House maintained the Artwork at a storage facility in New York City.

18. Between in or about March 2020 and in or about March 2021, after sanctions were imposed on Deripaska, GRAHAM BONHAM-CARTER, the defendant, communicated via email with the Auction House to arrange for the Artwork to be shipped from New York City to London. On or about March 24, 2021, BONHAM-CARTER made a $12,146.85 payment to the Auction House to cover shipping costs.

19. On or about May 25, 2021, the Auction House sent GRAHAM BONHAM-CARTER, the defendant, a letter advising him that

the Auction House had reason to believe that the Artwork belonged to Deripaska, who had been sanctioned by the United States. The Auction House requested written confirmation within 30 days that the Artwork, as well as the $12,146.85 payment to ship the Artwork, did not belong to Deripaska. In addition, the Auction House informed BONHAM-CARTER that without such confirmation, the Auction House would "block" the property, consistent with OFAC's requirements. The Auction House also requested documentation that BONHAM-CARTER was authorized to act on behalf of Turcos Limited.

20. On or about June 21, 2021, GRAHAM BONHAM-CARTER, the defendant, emailed the Auction House a copy of his credit card statement, which showed that BONHAM-CARTER had used his own credit card to make the $12,146.85 payment (the "Credit Card Statement"). In the cover email, BONHAM-CARTER stated, "The funds and the property do not belong to Mr[.] Deripaska. I am in the process of collating documentation showing ownership of the underlying assets (as well as documentation in connection with my authorization to communicate with [the Auction House] with respect to this account)."

21. In truth and in fact, GRAHAM BONHAM-CARTER, the defendant, understood that Deripaska had purchased the Artwork, that the Artwork remained Deripaska's property, and that the funds used to pay for shipping would be billed to Deripaska. BONHAM-CARTER's email communications reflect his knowledge. For example,

on or about June 21, 2021, BONHAM-CARTER emailed himself a scanned copy of the Credit Card Statement along with a cover sheet that stated that the payment to the Auction House was for "OVD House." In addition, on or about April 16, 2020, BONHAM-CARTER sent an email to a financial services firm, writing: "We have a large purchase of artwork sitting with [the Auction House] in NY and purchased under the name of Turcos way back in April 2008. [Bidder-1] was the bidder at the auction and I understand from [Bidder-1] that no one now wants or maybe can deal with Turcos admin as its seen as a very 'Hot cake' vis a vis OVD [*i.e.*, Deripaska] and the USA." Moreover, on or about January 22, 2021, in attempting to obtain a payment for Bidder-1 for his services to Deripaska over the course of several years, BONHAM-CARTER assured another employee of Deripaska that Bidder-1 was not intending to "blackmail[] someone as powerful and eminent as OVD."

22. In or about June and July 2021, GRAHAM BONHAM-CARTER, the defendant, asked the Auction House for two extensions to provide the paperwork requested. On or about August 27, 2021, after the second extension had lapsed without BONHAM-CARTER providing any supporting documents, the Auction House notified OFAC, in substance, that it was treating both the Artwork and the

$12,146.85 paid by BONHAM-CARTER as property of Deripaska, and therefore subject to sanctions, pursuant to OFAC regulations.

### Statutory Allegations

23.  From at least in or about 2020 through at least in or about 2021, in the Southern District of New York and elsewhere, GRAHAM BONHAM-CARTER, the defendant, and others known and unknown, did combine, conspire, confederate, and agree together and with each other to violate IEEPA, in violation of 50 U.S.C. § 1705, Executive Orders 13660, 13661, and 13662, and 31 C.F.R. § 589.201.

24.  It was a part and an object of the conspiracy that GRAHAM BONHAM-CARTER, the defendant, and others known and unknown, would and did violate, attempt to violate, and cause a violation of a license, order, regulation, and prohibition issued under IEEPA.

(Title 50, United States Code, Section 1705; Executive Orders 13660, 13661, and 13662, Title 31, Code of Federal Regulations § 589.201; and Title 18, United States Code, Section 2.)

### COUNT TWO
**(Violation of the International Emergency Economic Powers Act)**

The Grand Jury further charges:

25.  The allegations set forth above in Paragraphs 1 through 22 are realleged and incorporated by reference as if set fully forth herein.

26.  From at least in or about 2020 through at least in or about 2021, in the Southern District of New York and elsewhere,

11

GRAHAM BONHAM-CARTER, the defendant, violated, attempted to violate, and caused a violation of a license, order, regulation, and prohibition issued under IEEPA, to wit: BONHAM-CARTER willfully and knowingly provided and caused others to provide funds, goods, and services to and for the benefit of Oleg Vladimirovich Deripaska, whom OFAC had listed as an SDN, and companies owned and controlled by Deripaska, and received funds, goods, and services from Deripaska, without first having obtained the required approval of OFAC, and evaded and avoided the requirements of United States law with respect to the provision of funds, goods, and services to and for the benefit of Deripaska, in violation of Executive Orders 13660, 13661, and 13662, and 31 C.F.R. § 589.201.

(Title 50, United States Code, Section 1705; Executive Orders 13660, 13661, and 13662, Title 31, Code of Federal Regulations § 589.201; and Title 18, United States Code, Section 2.)

### COUNT THREE
### (Wire Fraud)

The Grand Jury further charges:

27. The allegations set forth above in Paragraphs 1 through 22 are realleged and incorporated by reference as if set fully forth herein.

28. From in or about 2020 through in or about 2021, in the Southern District of New York and elsewhere, GRAHAM BONHAM-CARTER, the defendant, knowingly having devised and intending to

12

devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, BONHAM-CARTER engaged in a scheme to deceive the Auction House to obtain property subject to U.S. sanctions, namely, the Artwork, by misrepresenting the true ownership of the Artwork and source of funds sent to the Auction House to cover shipping costs, which scheme involved the use of wires, including interstate wires into the Southern District of New York.

(Title 18, United States Code, Section 1343 and 2.)

**FORFEITURE ALLEGATION**

29. As a result of committing one or more of the offenses alleged in Count One, Count Two, and Count Three of this Indictment, GRAHAM BONHAM-CARTER, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461, all property, real and personal, which constitutes or is derived from proceeds traceable to the commission of the offenses alleged in Count One, Count Two, and Count Three, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of

13

said offenses.

## **Substitute Asset Provision**

30. If any of the property described above as being subject to forfeiture, as a result of any act or omission of GRAHAM BONHAM-CARTER, the defendant,

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with, a third party;

c.   has been placed beyond the jurisdiction of the court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p); and Title 28, United States Code, Section 2461 to seek forfeiture of any other property of the

14

defendant up to the value of the forfeitable property described above.

　　　　　　　(Title 18, United States Code, Sections 981;
　　　　　　　 Title 21, United States Code, Section 853;
　　　　　　　 Title 28, United States Code, Section 2461.)

FOREPERSON    9/21/22

DAMIAN WILLIAMS
United States Attorney

15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

GRAHAM BONHAM-CARTER,

Defendant.

## SEALED INDICTMENT

22 Cr. _____

(50 U.S.C. § 1705; Executive Orders 13,660, 13,661, and 13,662;
31 C.F.R. § 589.201; 18 U.S.C. §§ 1343 & 2.)

DAMIAN WILLIAMS
United States Attorney.

*[signature]*
Foreperson.
9/21/22

9/21/22   Filed Indictment under seal
Arrest warrant issued

(S.U.) Figueredo
*[initials]*